

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | Bk. No. SV 05-13855 MT |
| FRANCHISE PICTURES LLC, *et. al.*, | Chapter 11 (Jointly Administered) |
| Debtor(s). | Adv. No. SV 07-01080 MT |
| MORGAN CREEK PRODUCTIONS, INC., | |
| Plaintiff(s), | **MEMORANDUM OF DECISION RE: MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| FRANCHISE PICTURES LLC, a Delaware limited liability company and FRANCHISE ENTERTAINMENT LLC, a California limited liability company, | |
| Defendant(s), | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Intervenor-Defendant. | |

## I. <u>INTRODUCTION</u>

Defendants Franchise Pictures LLC and Franchise Entertainment LLC

(collectively referred to as "Franchise") filed a Motion for Partial Summary Judgment,

requesting the court to dismiss claims one, two, and seven of Plaintiff Morgan Creek

1  Productions, Inc.'s ("Morgan Creek" or "MCP") First Amended Complaint ("FAC") with

2  prejudice. Specifically, Franchise argues that (1) Morgan Creek's State Court Liens are

3  not perfected or enforceable and (2) the copyright mortgages do not secure Franchise's

4  indebtedness. For the reasons stated below, Franchise's motion for partial summary

5  judgment is granted.

6

7  ## II. **FACTS**

8  Franchise Pictures LLC ("Franchise Pictures") is a limited liability company

9  organized under the laws of Delaware on April 23, 1998. Franchise Entertainment LLC

10  ("Franchise Entertainment") is a limited liability corporation organized under the laws of

11  California on September 21, 1998.

12  1998 Agreement

13  Morgan Creek entered into an agreement with Franchise Entertainment on

14  October 20, 1998 ("1998 Agreement"). Under that agreement, Franchise was to

15  produce eight motion pictures for distribution by Morgan Creek. Morgan Creek was to

16  receive distribution rights and certain allocation of proceeds and revenues. Specifically,

17  Paragraph 2 of the 1998 Agreement states: "[Morgan Creek] will acquire all distribution

18  rights to the [Motion Pictures] in all media in perpetuity in the United States and Canada

19  and their respective territories and possessions (the 'Territory')."

20  Under Paragraph 4 ("Allocation of Proceeds") of the 1998 Agreement, "gross

21  receipts" were to be "allocated as follows":

22      (a)   MCP shall retain a distribution fee equal to 15% of the gross receipts.
    (b)   MCP shall recoup the following distribution expenses charged to MCP

23  by Warner: MPAA dues and assessments, taxes and checking and collection
costs (the "MCP Distribution Expenses").

24      (c)   FE [Franchise Entertainment] shall recoup the distribution expenses
it advances under Paragraph 6 [of the October 1998 Agreement].

25      (d)   FE shall recoup the negative cost of the applicable Qualifying Film on
a worldwide basis.

26

(e)    MCP shall receive (i) a 15% share of the balance of all revenues from the Territory, plus (ii) 15% of the gross revenues of the applicable Qualifying Film outside the Territory (after deduction of a 15% sales fee by FE and FE's actual ongoing sales costs on the revenues outside the Territory).

See Vandell Decl. Ex. 4 (October 1998 Agreement).

At the time that the 1998 Agreement was entered into between Morgan Creek and Franchise, the Motion Pictures had not been made or even identified. The 1998 Agreement refers only to an agreement between the parties related to "[t]he next eight (8) motion pictures financed, produced, controlled and/or acquired" by Franchise. See Vandell Decl., Exh. 4, ¶ 1.

Morgan Creek claims that since the signing of the 1998 Agreement, Franchise has failed to pay money owed to Morgan Creek pursuant to the 1998 Agreement, leading to multiple rounds of litigation.

The 2000 Agreements or "Copyright Mortgages"

In 2000, Morgan Creek entered into an Exclusive License of Distribution Rights, Security Agreement and Mortgage of Rights, Including Copyright for each of the eight qualifying Motion Pictures (collectively, the "Copyright Mortgages"). The eight qualifying Motion Pictures were subsequently delivered between February 2000 and August 2001[1]. Certain provisions of these Copyright Mortgages and how they relate to the 1998 Agreement control in part whether Morgan Creek has a secured claim against Franchise.

The Copyright Mortgages granted Morgan Creek a security interest in certain distribution rights in the Motion Pictures and in various collateral set forth in the Copyright Mortgages. Paragraph 1 of the Copyright Mortgages grants Morgan Creek in perpetuity certain distribution rights ('Distribution Rights') in the "Territory," a defined

---

[1]February 18, 2000 (The Whole Nine Yards); May 12, 2000 (Battlefield Earth); August 25, 2000 (Art of War); September 21, 2000 (Get Carter); January 19, 2001 (The Pledge); February 23, 2001 (3000 Miles to Graceland); May 18, 2001 (Angel Eyes); and August 27, 2001 (The Heist)

1   term consisting of the "United States, Canada, and their respective commonwealths,

2   territories and possessions."

3       The second paragraph of the Copyright Mortgages explains at the outset that

4   these rights are subject to Warner Brothers' ten-year distribution term: "It is

5   acknowledged that Secured Party [Morgan Creek] has sublicensed the Distribution

6   Rights to Warner Bros. (Warner') for a period of ten (10) years after the delivery of the

7   Picture to Warner (the `Warner Distribution Term')." See Vandell Decl. Exs. 9-17

8   (Copyright Mortgages ¶ 1).

9       Paragraph 2 then proceeds to describe the security interests transferred to

10  Morgan Creek. Paragraph 2(a), called "Grant #1" encompasses the distribution rights

11  collateral and reads as follows:

12      In order to secure Secured Party's Distribution Rights in the Picture for the
        Territory after the Warner Distribution Term, and in consideration of Secured
13      Party's agreements in connection with the exploitation of the Picture, Debtor
        hereby grants and assigns to Secured Party a continuing security interest in
14      and copyright mortgage on all of Debtor's right, title and interest in and to the
        items listed in (i)-(vi) below associated with or relating to the Picture
15      ("Distribution Rights Collateral").

16  See Vandell Decl. Exs. 9-16 (Copyright Mortgages 2(a)). Paragraph 2(b) then

17  describes "Grant #2" of the Copyright Mortgages, known as the "Proceeds Collateral"

18  as follows:

19      Solely to the extent necessary to secure Secured Party's right to receive the
        revenues to which it may be entitled to under Paragraph 4(e) of the
20      Multi-Picture Agreement [October 1998 Agreement], and in consideration of
        Secured Party's agreements in connection with the exploitation of the
21      Picture, Debtor [Franchise] hereby grants and assigns to Secured Party a
        continuing security interest in and to the copyright mortgage on all of
22      Debtor's right, title and interest in and to all of Debtor's rights in and to those
        certain accounts, inventories, and general intangibles, the proceeds of which
23      are defined as monies to which Secured Party may be entitled to under
        Paragraph 4 [restricted to subsection (e) in the Art of War and Get Carter
24      Copyright Mortgages] of the Multi-Picture Agreement (and in any bank
        account into which such proceeds have been or are to be deposited) derived
25      from or arising out of the Distribution Rights in the Territory after the Warner
        Distribution Term, and all other items deemed Inventories, Equipment,

26

- 4 -

Accounts and General Intangibles (as defined under the California Uniform Commercial Code or other applicable law) derived from or arising out of the Distribution Rights in the Territory after the Warner Distribution Term (the foregoing being referred to as the "Proceeds Collateral").

See Vandell Decl. Exs. 9-17 (Copyright Mortgages ¶ 2(b)) (italics added).

For purposes of this ruling, agreements relating to all eight of the movies will be discussed as a group as the differences between them do not affect the issues to be decided in this motion[2].

Franchise did not hold a copyright mortgage in the Motion Pictures at any time prior to or at the time the Copyright Mortgages were granted to Morgan Creek. See Turner Decl. ¶11; Vandell Decl. Exs. 9-17 (Copyright Mortgages). In 2000, before any of the litigation began, Morgan Creek filed with the Copyright Office a separate copyright mortgage on each of the eight Motion Pictures ("Copyright Mortgages").

Franchise argues that it has not received, after filing its bankruptcy petition, any proceeds (the "Participation Proceeds") arising from distribution of the Motion Pictures in the North American territory (the "Territory") as reflected in participation statements between Franchise and Morgan Creek Productions, Inc. See Brincko Decl. ¶ 2; FAC 21-24. Franchise also claims it does not have on hand any Participation Proceeds received pre-petition. Morgan Creek disputes this and seeks discovery before any determination is made on this issue.

Superior Court Judgment

On March 12, 2004, the Los Angeles Superior Court issued a judgment (the

---

[2] Six of the eight Copyright Mortgages are identically worded, involving the same two grants ("Grant #1" and "Grant #2") of security interests. Shorter than the other eight Copyright Mortgages, the Get Carter Copyright Mortgage does not involve Grant # 1 of security interest. See Vandell Decl. Ex. 17 (Get Carter Copyright Mortgage). The Art of War Copyright Mortgage involves two separate agreements, one between Filmline International Inc. and Morgan Creek (the "Filmline -Morgan Creek Agreement") (Vandell Decl. Ex. 15), and one between Franchise Pictures and Morgan Creek (the "Franchise - Morgan Creek Agreement") (Vandell Decl. Ex. 16). The Filmline - Morgan Creek Agreement does not involve Grant #2 of security interest but does include Grant#1. The Franchise - Morgan Creek Copyright Mortgage does not involve Grant #1 of security interest but does include Grant #2. See Vandell Decl. Exs. 15-16 (collectively the "Art of War Copyright Mortgage").

1    "State Court Judgment") in a dispute between Morgan Creek and Franchise, case no.

2    BC 280023, addressing breach of contract, fraud, and other issues arising from the

3    October 1998 Agreement and the December 2001 Agreement (the "December 2001

4    Agreement"). See Vandell Decl. Ex. 18 (State Court Judgment); FAC ¶¶ 9, 16-17.

5        The State Court Judgment included damages for breaching the implied covenant

6    of good faith and fair dealing in the December 2001 Agreement ($996,674) and for

7    breaching the October 1998 Agreement by: (1) Setting a "litigation reserve" on

8    participation statements to Morgan Creek for Art of War ($300,417) and (2) Deducting

9    "Foreign Residuals" on participation statements to Morgan Creek for The Whole Nine

10    Yards ($97,148). See Vandell Decl. Ex. 18 (State Court Judgment). In connection with

11    the State Court Judgment, Morgan Creek filed a Notice of Judgment Lien with the

12    California Secretary of State against Delaware-organized Franchise Pictures LLC on

13    March 18, 2004. See Vandell Decl. Ex. 19 (Notice of Judgment Lien); FAC ¶ 11.

14        Also in connection with the State Court Judgment, Morgan Creek filed an Order

15    to Appear for Examination Lien ("ORAP Lien") against California-organized Franchise

16    Entertainment LLC on March 16, 2004, and served the ORAP Lien on Franchise

17    Entertainment's Chief Financial Officer, Hans Turner, on March 24, 2004. See Vandell

18    Decl. Ex. 20 (ORAP Lien); Turner Decl. ¶ 12.

19        Morgan Creek did not file a renewal or extension of the ORAP Lien because of

20    its belief that an extension was not necessary because the one-year duration of the

21    ORAP lien was tolled when Franchise Entertainment filed for bankruptcy on August 18,

22    2004 in case no. SV 05-13855 MT.

23        Administrative Expense Motion

24        In June 2005, Morgan Creek filed a Motion to Compel Payment of Post-Petition

25    Administrative Expenses (the "Administrative Expense Motion"), seeking participation

26

1    fees under the distribution agreements. See Vandell Decl. Ex. 21 (Notice of Motion and

2    Motion to Compel Payment of Post-Petition Administrative Expense Claim to Creditor

3    Morgan Creek Productions Inc., In re Franchise Pictures, June 10, 2005).

4        In September 2005, the Court denied Morgan Creek's Administrative Expense

5    Motion. See Vandell Decl. Ex. 22 (Order Denying Motion to Compel Payment of

6    Post-Petition Administrative Expense Claim to Creditor Morgan Creek Productions Inc.,

7    In re Franchise Pictures, Sept. 7, 2005); Vandell Decl. Ex. 20 (Hearing Transcript on

8    Motion by Creditor Morgan Creek Productions to Compel Payment of Post-Petition

9    Administrative Expense Claim (Aug. 18, 2005)).

10       During the Administrative Expense proceedings, Morgan Creek asserted that it

11   "is the distributor of [the Motion Pictures] by the October '98 agreement. It is doing so

12   through Warner Brothers." See Vandell Decl. Ex. 23 (Administrative Expense Hearing

13   at p. 50, lines 21-23). Morgan Creek also admitted that "Morgan Creek itself is not

14   doing anything in incurring detriment that we know of. It really is Warner Brothers that's

15   engaging in the [film distribution] activity." See id. (Administrative Expense Hearing at

16   p. 19, lines 12-17).

17       Executory Contract Motion

18       In August 2006, Morgan Creek filed a Motion to Compel Assumption of

19   Executory Contracts (the "Assumption Motion"), asking this Court to compel Franchise

20   to assume the distribution agreements and requiring Franchise to cure all obligations

21   outstanding. See Vandell Decl. Ex. 24 (Assumption Motion, In re Franchise Pictures,

22   Aug. 18, 2006). In September 2006, the Court denied Morgan Creek's Assumption

23   Motion, ruling that these were not executory contracts. See Memorandum of Decision

24   and Order on Morgan Creek's Motion to Compel Assumption of Executory Contracts, In

25   re Franchise Pictures, Sept. 5, 2006.

26

1    <u>Asset Purchase Agreement</u>

2         In September 2006, Morgan Creek and FPLAC LLC (collectively, the

3    "Purchasers") entered into an Asset Purchase Agreement, approved by the Court,

4    under which Morgan Creek bought from Franchise the right to assets that included the

5    Motion Pictures (the "Asset Sale," which generated "Sale Proceeds" for Franchise).

6    <u>See</u> Purchase Agreement between Franchise Pictures LLC and Certain Affiliates and

7    SPE Holding Corp. and Certain Affiliates and FPLAC LLC and Morgan Creek

8    Productions, Inc. (Sept. 1, 2006)) ("Asset Purchase Agreement"); Order Granting

9    Motion to Approve Sale of Franchise Assets of Liens and Interests, Sept. 8, 2006.

10   <u>Adversary Complaint</u>

11        On May 3, 2007, Morgan Creek commenced an adversary proceeding against

12   Franchise, adv. no. SV 07-01080 MT.  Morgan Creek's First Amended Complaint, filed

13   on May 10, 2007, asks for, among other things: determination of validity, priority and

14   extent of Judgment liens; determination of validity, priority and extent of the Copyright

15   Mortgages; and for turnover of monies subject to secured claims.

16        On October 2, 2007, Franchise filed a Motion for Partial Summary Judgment,

17   requesting that this court dismiss claims one, two, and seven of Morgan Creek's First

18   Amended Complaint with prejudice, hold that Morgan Creek does not have any secured

19   claims on any property of Franchise by reason of the Copyright Mortgages, hold that

20   Morgan Creek's State Court Liens are not perfected or enforceable, and hold that the

21   copyrights do not secure the indebtedness under the Judgment.

22        To the extent any uncontroverted fact is deemed a conclusion of law, it is

23   incorporated herein by reference as if set out in full.

24

25

26

## III. **DISCUSSION**

Under F.R.C.P. Rule 56(c), incorporated by F.R.B.P. Rule 7056, summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a mater of law."  The moving party has the burden of establishing the absence of a genuine issue of material fact.  Celotex Corp. vs. Catrett, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial.  Id. at 324.  The court must view the evidence in the light most favorable to the nonmoving party.  Bell v. Cameron Meadows Land Co., 669 F.2d 1278, 1284 (9th Cir. 1982).  All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party.  Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976). Moreover, the inference drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  Valadingham v. Bojorquez, 886 F.2d 1135, 1137 (9th Cir. 1989).

### **First Claim For Relief**

Morgan Creek's first claim for relief in its First Amended Complaint is for determination of validity, priority and extent of the judgment liens of Morgan Creek arising from the Judgment.  Specifically, Morgan Creek seeks in its First Amended Complaint that it "is entitled to a determination by this [c]ourt that the pre-petition date judgment liens, were, as of the petition date and at all relevant times thereafter, duly perfected and not avoidable liens against the personal property of Franchise Entertainment and Franchise Pictures, and both of them, and that such liens are valid and enforceable against the proceeds, to the extent of the Judgment, including the

1  continuing statutory interest thereon" ("Claim #1").

2  Judgment Lien

3  Franchise first argues that the Morgan Creek Notice of Judgment Lien against

4  Franchise Pictures is invalid under California law because Franchise Pictures is a

5  Delaware company. Morgan Creek filed a Notice of Judgment Lien against Franchise

6  Pictures with the California Secretary of State. Filing a Notice of Judgment Lien in

7  California is not a valid means to create a judicial lien against the California personal

8  property of a non-California business. See In re Aura Systems, 347 B.R. 720, 725

9  (Bankr. C.D. Cal. 2006); Cal. Code Civ. Proc. §697.510, 697.530; Cal. Com. Code §§

10  9307(e), 9301(1); 6 Del. C. §§ 9-310, 9-501(a). Since the lien was only filed in California

11  and not Delaware, the Notice of Judgment Lien against Franchise Pictures is invalid.

12  Franchise Assets

13  Franchise argues that the ORAP Lien is worthless because Franchise

14  Entertainment has no assets. Morgan Creek's opposition argues that this is an

15  assertion of fact that is the subject of pending discovery propounded by Morgan Creek

16  and that it has not yet had an opportunity to conduct discovery on this issue. Morgan

17  Creek requests a F.R.C.P. Rule 56(f) continuance. Pursuant to F.R.C.P. Rule 56(f),

18  made applicable by F.R.B.P. Rule 7056, "Should it appear from the affidavits of a party

19  opposing the motion that the party cannot for reasons stated present by affidavit facts

20  essential to justify the party's opposition, the court may refuse the application for

21  judgment or may order a continuance to permit affidavits to be obtained or depositions

22  to be taken or discovery to be had or may make such other order as is just." Under

23  F.R.C.P. Rule 56(f), "[t]he burden is on the party seeking further discovery to proffer

24  sufficient facts to show that the evidence sought exists and that it would prevent

25  summary judgment," but the court "does not abuse its discretion by denying further

26

1   discovery if the movant had failed diligently to pursue discovery in the past." Nidds v.

2   Schindler Elevator Corp., 113 F.3d 912, 921 (9th Cir. 1996).

3          Morgan Creek specifically argues that the subject of Morgan Creek's pending

4   discovery requests involve the parties' intent in Paragraph 2(b) of the Copyright

5   Mortgages and whether Franchise Entertainment has ever had any assets. While a

6   Rule 56(f) request soon after the filing of a complaint would normally carry significant

7   weight, the current request follows years of Morgan Creek's access to Franchise

8   records and employees.

9          There appears to be no dispute that Morgan Creek conducted extensive

10  discovery for purposes of "multiple rounds of litigation" in the Superior Court against

11  Franchise and Franchise Entertainment from 2001 through 2004. As this litigation

12  concerned what monies were due Morgan Creek under the agreements, the assets in

13  Franchise's possession would have been covered in that discovery. Following its

14  judgment, Morgan Creek allegedly spent two weeks reviewing documents at

15  Franchise's headquarters and conducted numerous debtor examinations to explore the

16  financial condition of the Franchise entities. See Reply Declaration of Hans Turner.

17         Morgan Creek argues that the attorney who supervised the post-judgment

18  discovery is not currently available to it because of subsequent employment issues not

19  relevant here. While that attorney may not be able to assist in reviewing the discovery

20  that was already produced, Morgan Creek does not explain why that discovery is not in

21  its possession for other counsel to review.

22         This bankruptcy case has also been pending for well over three years. If Morgan

23  Creek has intended to pursue a secured claim all this time, it does not explain why no

24  effort was made to gather previous discovery documentation for review or to make

25  additional requests of the debtor. It has litigated an administrative expense claim, an

26

1   executory contract motion and the asset purchase agreement and never mentioned its

2   lack of access to such essential information. In fact, since Morgan Creek qualified as a

3   potential bidder during the Asset Purchase Agreement process, it was, along with other

4   potential bidders, given access to extensive information about all of the administratively

5   consolidated debtors' assets in an effort to ascertain the value thereof.

6        This case is winding to a close after six continuous years of disputes between

7   Franchise and Morgan Creek, and the summary judgment motion must be viewed in

8   that context. Morgan Creek's one assertion that limited discovery may be appropriate

9   as to the issue of whether Franchise Pictures and Franchise Entertainment are

10   essentially the same entity may deserve consideration. Because Franchise's own

11   substantive consolidation complaint was placed on hold to conserve resources pending

12   further developments in the bankruptcy case, discovery on that issue was placed on

13   hold for all parties. Thus, extremely limited and narrow discovery may be necessary for

14   Morgan Creek to adequately respond to the question of what assets the ORAP lien

15   seeks to secure.

16        Because all reasonable doubt and inference is viewed in light most favorable to

17   Morgan Creek, the nonmoving party, see Valadingham v. Bojorquez, 886 F.2d at 1137,

18   Hector v. Wiens, 533 F.2d at 432, for the purpose of this motion, this court must

19   assume that Franchise Entertainment has potential assets, and the ORAP Lien may not

20   be worthless. The question of the parties' intent in the agreements is discussed

21   subsequently.

22        <u>Expiration of the ORAP Lien</u>

23        Franchise argues that the ORAP Lien expired in March 2005 and is therefore

24   invalid. According to California Code of Civil Procedure §708.110(d), "Service of the

25   order creates a lien on the personal property of the judgment debtor for a period of one

26

1  year from the date of the order unless extended or sooner terminated by the court."

2  Franchise argues that the service date was March 2004 and the ORAP Lien expired in

3  March 2005. Franchise filed its Chapter 11 petition on August 18, 2004. The question

4  is whether the one-year duration of the ORAP Lien was tolled or extended in order to

5  avoid the March 2005 expiration provided for under § 708.110(d).

6  Under 11 U.S.C. § 108(c): "if applicable nonbankruptcy law, an order entered in

7  a nonbankruptcy proceeding, or an agreement fixes a period for commencing or

8  continuing a civil action in a court other than a bankruptcy court on a claim against the

9  debtor, . . . and such period has not expired before the date of the filing of the petition,

10  then such period does not expire until the later of--(1) the end of such period, including

11  any suspension of such period occurring on or after the commencement of the case; or

12  (2) 30 days after notice of the termination or expiration of the stay . . . with respect to

13  such claim." This section generally applies "to time periods within which a creditor must

14  bring an action to enforce a lien before the lien expires. It also applies to the time

15  period to renew a judgment to maintain its enforceability." 4 Collier on Bankr. ¶

16  108.04[2] (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 15th ed. rev. 2007)

17  (footnotes omitted).

18  As the bankruptcy case is still pending, and no relief from stay has been granted,

19  the ORAP lien still continues in force at this time. See also In re Burns, 291 B.R. 846,

20  849 n3 (9th Cir. B.A.P. 2003).

21  Federal Preemption

22  Franchise further argues that the ORAP Lien does not encumber the copyrights

23  for the Motion Pictures or proceeds thereof. In In re World Auxiliary Power Company,

24  303 F.3d 1120, 1128 (9th Cir. 2002), the Ninth Circuit held that "there can be no

25  question that, when a copyright has been registered, a security interest can be

26

1  perfected only by recording a transfer in the Copyright Office," and further held

2  unregistered copyrights need not be registered in the Copyright Office.  In re Peregrine

3  Entertainment, Ltd., adopted substantially by World Auxiliary, held that "any state

4  recordation system pertaining to interest in copyrights would be preempted by the

5  Copyright Act."  116 B.R. 194, 194 (C.D. Cal. 1990).  The Copyright Act provides that

6  "[a]ny transfer of copyright ownership or other document pertaining to a copyright" may

7  be recorded in the U.S. Copyright Office.  17 U.S.C. §205(a).  Peregrine explained that

8  "[r]ecording in the U.S. Copyright Office, rather than filing a financing statement under

9  Article Nine, is the proper method for perfecting a security interest in a copyright."  116

10  B.R. at 203.

11       Relying on Peregrine and World Auxiliary Power, Franchise argues that the only

12  way to perfect the copyrights is to register the ORAP Lien with the U.S. Copyright

13  Office, which Morgan Creek failed to do.  It is undisputed that the copyrights at issue

14  are all registered with the U.S. Copyright Office.  Morgan Creek argues that application

15  of Peregrine's analysis to an ORAP lien would be an unwarranted extension.  Relying

16  on Broadcast Music, Inc. V. Hirsch, 104 F. 3d 1163 (9th Cir 1997), it argues that the

17  ORAP lien is more like an assignment of royalties that does not have to be recorded in

18  the Copyright Office.

19       While Peregrine and World Auxiliary Power employ broad terms as to whether

20  federal copyright law preempts state law security interests, both addressed solely

21  federal Copyright Act preemption as applied to the filing of a UCC-1 financing statement

22  pursuant to California's version of the old Article 9 of the Uniform Commercial Code.

23  The issue here is whether the ORAP lien as it applies to the registered copyright

24  mortgages in the eight motion pictures is the equivalent of the UCC-1 discussed in

25  World Auxiliary so that it needed to have been filed in the Copyright office, or whether it

26

1    falls within the "assignment of royalties" category discussed in <u>BMI v. Hirsch</u> where a

2    state assignment system is sufficient to perfect the lien.

3            Under California Code of Civil Procedure § 708.110(d), service of the ORAP

4    "creates a lien on the personal property of the judgment debtor...." Service of the

5    ORAP alone would create an enforceable lien in Franchise's property, even without a

6    levy on any property. <u>In re Burns</u>, 291 B.R. 846, 849 (9th Cir. BAP 2003); <u>Imperial</u>

7    <u>Bank v. Pim Electric, Inc.</u>, 33 Cal. App. 4th 540, 552 (Ct. App. 1995). The property

8    does not have to be described in detail. <u>Burns</u> at 851; <u>Imperial Bank</u> at 553. It is

9    specifically allowed to be, in effect, a "secret" lien as it is not recorded or published.

10   "Other creditors are able to discover the lien only if they know about the creditor's

11   judgment and review the court file." Hon. Alan M. Ahart, <u>Cal. Practice Guide: Enforcing</u>

12   <u>Judgments & Debts</u> §6:1306 (The Rutter Group 2007). The lien may be lost upon

13   transfer of the property to certain persons such a bona fide purchasers in the ordinary

14   course of business. Id. at §6:1305, citing CCP §§ 697.740, 697.910, 697.920.

15           While the assignment of future royalties may not be sufficiently related to the

16   underlying copyright to be subject to the Copyright Act, a lien on copyrights or copyright

17   mortgages, as is sought by the ORAP lien, is the type of encumbrance discussed in

18   <u>World Auxiliary</u> and <u>Peregrine</u> that the Copyright Act seeks to regulate. One significant

19   purpose of the Copyright Act is to give notice of any transfer of a registered copyright. A

20   "secret" lien such as an ORAP lien is inconsistent with the Copyright Act's purpose.

21   <u>Hirsch</u> simply does not involve rights analogous to an ORAP lien. <u>Hirsch</u> involved an

22   assignment of royalties for the purpose of satisfying a debt, not an assignment of a

23   security. The rationale for recordation – "to provide notice to prospective creditors or

24   purchasers of the copyright who may rely to their detriment on the appearance of

25   ownership of the rights under a copyright - is inapposite." <u>Hirsch</u>, 104 F. 3d at 1166.

26

1    Peregrine also held that a judicial lien is a transfer under the Copyright Act.  116

2   B.R. at 205-206.  A judicial lien creditor is defined as "a creditor who has obtained a lien

3   'by judgment, levy, sequestration, or other legal or equitable process or proceeding'"

4   pursuant to 11 U.S.C. §101(32).  Id. at 205.  Morgan Creek's ORAP Lien, a judicial lien,

5   is a "transfer" subject to the Copyright Act.  Since it is undisputed that the subject

6   copyrights were registered, the copyrights encumbered by the ORAP Lien can only be

7   perfected by recording in the U.S. Copyright Office pursuant to World Auxiliary, 303

8   F.3d 1120, 1128, which Morgan Creek failed to do.  Thus, the copyrights encumbered

9   by the ORAP Lien are unperfected.

10    Partial summary judgment is granted in favor of Franchise with respect to this

11   claim.  Whether any property aside from the copyrights is covered by the ORAP Lien is

12   not at issue in this motion and is not ruled on here.

13   **Second Claim for Relief**

14    Morgan Creek's second claim for relief in its First Amended Complaint is for

15   determination of validity, priority and extent of the Copyright Mortgages.  Specifically,

16   Morgan Creek claims it is "entitled to a determination by this [c]ourt that the Copyright

17   Mortgages were, as of the Petition Date and at all relevant times thereafter, valid, duly

18   perfected and not avoidable liens against each of the motion pictures described therein

19   and the Proceeds thereof, and such Copyright Mortgages secure the obligations of

20   Franchise Entertainment, Franchise Pictures and, to the extent applicable, an Affiliate,

21   and each of them, for and on account of (a) participation claims, and (b) distribution

22   fees..." ("Claim #2").  This claim depends largely on the interpretation of the different

23   agreements between the parties.

24    "Several contracts relating to the same matters, between the same parties, and

25   made as parts of substantially one transaction, are to be taken together."  Cal. Civ.

26

1   Code §1642; see also Cates Construction, Inc. v. Talbot Partners, 21 Cal. 4th 28. 39

2   (1999). Morgan Creek correctly argues that the 1998 Agreement and the Copyright

3   Mortgages are contracts "relating to the same matters, between the same parties, and

4   made as parts of substantially one transaction." Cal. Civ. Code §1642. The

5   interpretation of a contract must give effect to the mutual intention of the parties. Cal.

6   Civ. Code § 1636; G Ins. Co. of Mich. v. Homestore, Inc., 137 Cal. App. 4th 749, 755

7   (2006). The mutual intent of contracting parties is to be inferred, if possible, solely from

8   the written provisions of the contract. Homestore, 137 Cal. App. 4th at 755.

9   Under Travelers Cas. and Sur. Co. v. American Intern. Surplus Lines Ins. Co., 465

10  F.Supp. 2d 1005, 1012 (S.D. Cal. 2006), "[w]hen a contract is not ambiguous, summary

11  judgment may be entered based on the court's interpretation of clear and unambiguous

12  provision which present only questions of law."

13          Here, specific provisions of these agreements along with undisputed facts show

14  that the Copyright Mortgages do not encumber property or secure obligations of

15  Franchise. The agreements plainly (1) provide for Morgan Creek to own the distribution

16  rights and (2) are subject to the assignment to Warner Brothers for a term of ten years.

17  Morgan Creek has asked for time to conduct discovery as to the parties' intent in

18  drafting the agreements  but has shown no area where the contracts are ambiguous to

19  question either of those basic facts. To the contrary, these factual matters are

20  undisputed and solely the legal conclusions to be drawn are in dispute.

21          Morgan Creek's Acquisition of Distribution Rights

22          Pursuant to their express terms, the Copyright Mortgages do not create a

23  present lien on any property of Franchise. There is no collateral under the Copyright

24  Mortgages because their express terms limit the collateral to revenues received from

25  distribution of the Motion Pictures in the Territory (Grant #1) and certain proceeds and

26

1   other property derived from or arising out of those distribution rights (Grant #2).

2   Franchise does not own any distribution rights because the distribution rights were

3   already assigned in perpetuity to Morgan Creek in 1998.

4       Morgan Creek explains that no distribution rights were transferred in 1998

5   because no Motion Pictures existed at that time and the 1998 Agreement contained a

6   future promise that when the Motion Pictures were made, Morgan Creek would obtain

7   distribution rights in the films. Morgan Creek believes that the 1998 Agreement and the

8   Copyright Mortgages, read together, create a valid and enforceable security interest for

9   Morgan Creek. While the 1998 and 2000 agreements must be read together, it is not

10  clear how this argument benefits Morgan Creek. Regardless of whether the 1998

11  agreement alone or only in conjunction with the subsequent agreements granted the

12  distribution rights, there is no dispute that Morgan Creek acquired the distribution rights

13  at least by the time the Copyright Mortgages were obtained in 2000 and certainly before

14  Franchise filed bankruptcy.

15      At the time Franchise filed bankruptcy, and at all times thereafter, Franchise had

16  no interest in the collateral under the Copyright Mortgages. The transfer of the

17  exclusive distribution rights was perfected by exclusive licenses granted to Morgan

18  Creek in Paragraph 1 of the Copyright Mortgages, which were then recorded in the

19  Copyright Office. Under the Copyright Revision Act of 1976, 17 U.S.C. § 101, *et seq.*,

20  the exclusive license of distribution rights in perpetuity in virtually all media in the

21  Territory effected a transfer or a completed assignment of the distribution rights to

22  Morgan Creek. See 17 U.S.C. § § 101, 106, & 201. Since Franchise had no interest in

23  the collateral, the Copyright Mortgages did not and do not encumber any property of the

24  Franchise Estates. See Zenith Productions Ltd. V. AEG Acquisition Corp. (In re AEG

25  Acquisition Corp.), 161 B.R. 50, 59-60 (9th Cir. BAP 1993), *aff'g* Official Unsecured

26

1   Creditor's Committee v. Zenith Productions, Ltd (In re AEG Acquisition Corp.), 127 B.R.

2   34 (Bankr. C.D. Cal 1991) (under Copyright Act, exclusive licenses are transfers of

3   copyright ownership and a prepetition grant of an exclusive license is a completed

4   prebankruptcy transfer).

5        The question does arise, however, of why the Copyright Mortgages would

6   purport to grant Morgan Creek a "continuing security interest and . . . copyright

7   mortgage on" the distribution rights and certain proceeds and property derived

8   therefrom. This was actually explained by Morgan Creek's declarant, David

9   Nochimson. Mr. Nochimson, a highly experienced entertainment attorney who

10  participated in drafting the agreements, explained that:

11          it is standard in the motion picture industry for a party who previously entered
            into an agreement to acquire distribution rights in a motion picture (or
12          pictures) that was not in production at the time of the agreement, to enter
            into a second agreement after the motion picture is produced. This second
13          agreement identifies the then-produced motion picture and grants the
            distribution rights (because there were no such rights to grant at the time of
14          the first agreement). The second agreement nearly always also grants a
            security interest in and copyright mortgage on the motion picture to secure
15          the acquiring party's right to have the benefit of the distribution rights
            throughout the term of the distribution agreement and its right to receive
16          revenue from the exploitation of the motion picture. Security interests of this
            type are used by distributors (such as Morgan Creek and every major studio)
17          to protect them against a producer (such as Franchise).

18  See Nochimson Decl. ¶ 12. This interest was taken protectively in case the debtor or

19  another party challenged Morgan Creek's distribution rights during the bankruptcy

20  proceeding. This conceivably could have happened here if Franchise had claimed that

21  the contract were executory and had sought to reject it. In fact, the contrary occurred -

22  Morgan Creek has been attempting to enlarge its rights under the contract while

23  Franchise has continuously respected Morgan Creek's exclusive distribution rights.

24  Because Morgan Creek's exclusive distribution rights have never been challenged,

25  neither Grant #1 nor Grant #2  have ever been necessary to invoke.

26

<u>Typographical Error</u>

Franchise also argues that Grant #2 is based on a nonexistent security interest in the Copyright Mortgages, and since Franchise had no prior copyright mortgage to grant Morgan Creek, there is a nonexistent collateral.  Morgan Creek counters by stating that there was a typographic error in Paragraph 2(b) that resulted from mutual mistake and that "copyright mortgage" is intended to mean "copyright."  Morgan Creek argues that there was a typographical error in Grant #2 - that the phrase "hereby grants and assigns to Secured Party a continuing security interest in and to the copyright mortgage on all of Debtor's right,..." should instead read "a continuing security interest in and copyright mortgage ", leaving out the words "to the".  This drafting error is explained in the declaration of David Nochimson who participated in the drafting of each of the agreements at issue.  Declaration of David Nochimson ("Nochimson Decl."), ¶¶ 6-11.

Under <u>Maffei v. Northern Ins. Co. of New York</u>, 12 F.3d 892, 898 (9th Cir. 1993), "[w]hether contract provision is ambiguous is a question of law.  If it is, ordinary summary judgment is improper because differing views of the intent of the parties will raise genuine issues of material fact."  Under <u>Brobeck, Phleger & Harrison v. Telex Corp.</u>, 602 F.2d 866, 871-872 (9th Cir. 1979), "[e]ven if the written agreement is clear and unambiguous on its face, the trial judge must receive relevant extrinsic evidence that can prove a meaning to which the language of the contract is reasonably susceptible.  If the court finds after considering this preliminary evidence that the language of the contract is not reasonably susceptible of interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract...The case may then be disposed of by 'summary judgment.'"  Since inferences drawn from underlying facts must be viewed in light favorable to

1    Morgan Creek and it appears that there may have been a typographic error and/or

2    mutual mistake, the contract provision will be read as proposed by Morgan Creek for

3    purposes of this motion.  To the extent that Franchise's argument turns on the

4    interpretation of this phrase, the phrase will be reformed as explained in the Nochimson

5    declaration.  This reformation, however, does not change the result of the agreement –

6    it still grants all distribution rights to Morgan Creek.

7            Warner Brothers Distribution Term

8            Even if the Distribution Rights and Proceeds Collateral had present value, the

9    Copyright Mortgages do not become enforceable until after the expiration of a ten-year

10    distribution term granted to Warner Brothers.  Morgan Creek's contention that it has a

11    present perfected lien on a present interest that is simply subject to Warner Brother's

12    ten-year distribution term is inconsistent with both the language of the agreements and

13    the California Commercial Code.

14            The language of the Copyright Mortgages states that Morgan Creek's security

15    interests secure rights after the Warner Distribution term.  Grant #1 specifically states

16    "[i]n order to secure Secured Party's [Morgan Creek's] Distribution Rights in the Picture

17    for the Territory after the Warner Distribution Term..."  Grant #2 of the Copyright

18    Mortgages similarly limit Morgan Creek's continuing security interest in

19    "proceeds...derived from or arising out of the Distribution Rights...after the Warner

20    Distribution Term, and all other items deemed Inventories, Equipment, Accounts and

21    General Intangibles...derived from or arising out of the Distribution Rights in the

22    Territory after the Warner Distribution Term."  It is undisputed that the Warner

23    Distribution Term has not ended.

24            Pursuant to California Commercial Code §9203(a), "[a] security interest attaches

25    to collateral when it becomes enforceable against the debtor with respect to the

26

1   collateral, unless an agreement expressly postpones the time of attachment."  Pursuant

2   to California Commercial Code §9203(b): "...a security interest is enforceable against

3   the debtor and third parties with respect to the collateral only if each of the following

4   conditions is satisfied...(2) The debtor has rights in the collateral or the power to

5   transfer rights in the collateral to a secured party."

6          Morgan Creek is not a secured party under the express language of the

7   Copyright Mortgages since its security interest does not arise until after the ten-year

8   Warner Brothers Distribution Term - hence, there is no present security interest under

9   the Copyright Mortgages. (Copyright Mortgages  2(a), 2(b)); Cal. Civ. Code § 1636;

10  Homestore, 137 Cal. App. 4th at 755.

11         Franchise's final argument is that the Copyright Mortgages do not secure the

12  major portion of the debt evidenced by the Judgment.  Based on the above ruling, there

13  is no need to address what parts of the state court judgment represented secured debt.

14  Numerous other issues were raised in the briefs, but none of them are necessary to

15  address further.

16  **Seventh Claim for Relief**

17         Morgan Creek's seventh claim for relief is for turnover of monies subject to

18  secured claims.  Specifically, Morgan Creek requests that it "is entitled to the immediate

19  turnover of all monies, including the Proceeds, subject to the various judgment liens,

20  Copyright Mortgages, security interests and other interests of Morgan Creek as

21  hereinabove described".  As the funds held by Franchise are not secured, there is no

22  basis for an immediate turnover of monies subject to Morgan Creek's claims.

23

24  **IV. CONCLUSION**

25         While summary judgment should be granted with caution, Anderson v. Liberty

26

1    Lobby, 477 U.S. 242, 255 (1986), the litigation between these parties now spans six

2    years and two courts, and the above issues can be decided as a matter of law, even

3    making all reasonable inferences and resolving all disputed facts in favor of Morgan

4    Creek.  Franchise's partial summary judgment motion is granted.

5        For the foregoing reasons, partial summary judgment should issue in Franchise's

6    favor, with holdings that: Morgan Creek does not have any secured claims on any

7    property of Franchise by reason of the Copyright Mortgages; Morgan Creek's State

8    Court Liens are not perfected or enforceable; and the Copyrights do not secure the

9    indebtedness under the State Court Judgment.

10        The request for a F.R.C.P. Rule 56(f) continuance is denied.

11

12    DATED:    1/25/08

13

14                                         Maureen A. Tighe

15                                         **MAUREEN A. TIGHE**
                                           United States Bankruptcy Judge

16

17

18

19

20

21

22

23

24

25

26

- 23 -

1

## CERTIFICATE OF SERVICE BY MAIL

2

3    I certify that a true copy of this **ORDER** was mailed on _____ 'JAN 2 5 2008

4    to the parties listed below:

5

6    **Morgan Creek Productions, Inc.**                    **Sally S Neely**
     103571 Santa Monica Blvd., Suite 200                  555 W Fifth St Ste 4000
7    Los Angeles, CA 90025                                 Los Angeles, CA 90013-1010

8
     **JOSEPH P EISENBERG**                                **Daniel Scott Schecter**
9    1900 Avenue of the Stars, 7th fl.                     Latham & Watkins
     Los Angeles, CA 90067                                 633 W 5th St Ste 4000
10                                                         Los Angeles, CA 90071-2007

11   **Franchise Pictures LLC**
     12100 Wilshire Blvd., Suite 1030
12   Los Angeles, CA 90025

13
     **David L. Neale**
14   Levene Neale Bender Rankin & Brill LLP
     10250 Constellation Blvd Ste 1700
15   Los Angeles, CA 90067

16   **Michael S Lurey**
     633 West 5th St Ste 4000
17   Los Angeles, CA 90071-2007

18

19

20

21   Dated:    JAN 2 5 2008                                _____

22                                                         DEPUTY CLERK

23

24

25

26